Sharon M. FRANKEL, Plaintiff,

v.

UNITED STATES POSTAL
SERVICE, Defendant.

No. C.A. 98–11074–NG.

United States District Court,
D. Massachusetts.

March 31, 2000.

**20**

Kevin G. Powers, Boston, MA, for Sharon Frankel, plaintiff.

John A. Capin, United States Attorney's Office, Boston, MA, Peter K. Levitt, United States Courthouse, Assistant U.S. Attorney, Boston, MA, for United States Post Office, defendant.

### MEMORANDUM AND ORDER

GERTNER, District Judge.

The Plaintiff, Sharon Frankel ("Frankel"), brings this action against her former employer, the United States Post Office ("Post Office"). She alleges that the Post Office discriminated against her because of her sex and because she took leave time protected by the Family Medical Leave Act ("FMLA").[1] She also brings retaliation claims under both the FMLA and Title VII.[2]

The Post Office has moved for summary judgment [docket entry # 14] arguing that the adverse employment actions it took against Frankel were all taken for legitimate, non-discriminatory reasons, and that Frankel has failed to meet her burden of producing enough evidence that a reasonable jury could infer that the Post Office's proffered non-discriminatory reasons are a pretext for discrimination.[3]

1. The sex discrimination claim is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the FMLA discrimination claim is brought pursuant to 29 U.S.C. § 2611 *et seq.* Originally, the Plaintiff brought an additional claim against the Post Office under the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*, and intentional tort claims against an individual employee of the Post Office. Plaintiff has chosen not to oppose summary judgment on the Rehabilitation Act claim. The intentional tort claims, defamation and interference with a contractual relationship, are no longer viable because the United States was substituted as Defendant for the individual employee [docket entry # 29, # 30]. The particular tort claims cannot be maintained against the United States in accordance with the Westfall Act. *See* 28 U.S.C. § 2680(h).

2. *See* 42 U.S.C. § 2000e–3(a); 29 U.S.C. § 2615(a)(2); 29 U.S.C. § 2615(b)(1).

3. The Post Office also argues that Frankel did not seek Equal Employment Opportunity ("EEO") counseling within the 45 day statutory limit, and that Frankel did not wait 180 days from the filing of the EEO complaint before filing this suit. However, Frankel did contact the EEO within 45 days of the specific adverse employment actions that will be the subject of Frankel's remaining retaliation claims: (1) the lengthy emergency off-duty status, (2) the order to submit to a medical evaluation, (3) abolishing Frankel's position on April 4, 1997, and (4) issuing a suspension effective April 26, 1997, for fourteen days that was ultimately reduced to a letter of warning. Frankel also waited over 180 days prior to filing her lawsuit. Simply because the Equal Employment Opportunity Commission ("EEOC") decided to suspend its investigation during part of that time period does not change the fact that Frankel waited the requisite 180 days. On April 30, 1998, the EEOC issued a right to sue letter. Plaintiff had 90

Because I find insufficient evidence from which a jury could reasonably infer that the Post Office's articulated reasons for its conduct were a pretext for discrimination, Defendant's motion for summary judgment with respect to the discrimination claims is **GRANTED**. Because I find that a reasonable jury could find that some of the challenged conduct was in retaliation for Frankel's complaints of discrimination, Defendant's motion for summary judgment with respect to the retaliation claims is **DENIED**.

## I. *FACTUAL BACKGROUND*

This case arises out of an extremely unfortunate series of events. In early November of 1996, Frankel suffered a miscarriage which caused her to miss some work. She told only one co-worker the reason for her absence, and on Frankel's instructions, that co-worker reported the reason to Frankel's supervisor requesting that the information remain confidential. Frankel's supervisor, Peter Bombassaro ("Bombassaro"), honored her request and did not share the information with anyone in the office.

On or about December 6, 1996, Patrick Ring ("Ring"), then manager of Customer Service Support for the Post Office, instructed his subordinates to take action against employees to control the use of sick leave, and unknowingly set forth a chain of events that culminated in the filing of this lawsuit.

Thomas Lyons ("Lyons"), a management employee subordinate to both Ring and Bombassaro, decided to conduct "official discussions" advising five employees of the Post Office's sick leave policy.[4] Each of the five employees had used more sick leave than they had accrued in the previous quarter. Frankel was among them.

While Frankel did use more than her accrued sick leave for the previous quarter, she maintains (and the Post Office does not dispute this fact) that she nonetheless had significant amounts of accrued, unused, sick leave as of mid-December 1996 (the Court assumes sick leave is computed on an annual basis). Presumably, the sick leave policy permitted an employee to use sick leave that was accrued and not used in previous quarters.

Some of the sick leave time Frankel had used in the previous quarter was in connection with her miscarriage and subsequent treatment. However, when Lyons decided to conduct the "official discussion" with Frankel, he had no idea what Frankel had experienced. Lyons had no basis to believe that Frankel was absent for any reason other than routine illness.

On December 19, 1996, Lyons decided to conduct the official discussions. His first two discussions were with Carol LaCommare ("LaCommare") and Stanley Mattox. Each felt that the "official discussion" was unwarranted and inappropriate. Nonetheless, Lyons continued with his plan to give "official discussions" to these employees.

Frankel did not want to have a discussion with Lyons concerning her sick leave without a union steward present. The union steward informed Lyons that he believed the discussion constituted harassment.[5] Lyons indicated that he would continue with the discussion and Frankel requested that the union steward file a

days to file suit and did so shortly thereafter, almost a full year after the EEO complaint was filed.

4. "Official discussions" are considered a form of reprimand, records of which are kept in an employee's file.

5. The union steward argued that the discussions were harassment because the collective bargaining agreement did not permit Lyons to conduct an "official discussion" solely for

employees using more sick leave than accrued in any given quarter. The union steward did not know that Frankel had suffered a miscarriage or any other serious medical condition and, therefore, did not inform Lyons of this information. Significantly, the harassment allegations were not connected to Frankel's miscarriage. Rather, it was for reprimanding employees who had not abused sick leave policy.

grievance. The union steward agreed to file a grievance and left the office. Lyons and Frankel were then left alone in the office. They were seated facing each other in chairs about two to three feet apart.

Lyons still did not know that Frankel had missed work because of a miscarriage, or because of any other serious medical condition. Frankel testified in her deposition that she instructed the union steward to inform Lyons that she was out for a "medical reason."

After the steward left, Lyons proceeded with the discussion explaining that Frankel had exceeded her accrued sick leave time for the previous quarter. Lyons showed Frankel her attendance record, on which the dates of her recent absences were highlighted. At that point, Frankel began to cry and, while rising from her seat, exclaimed, "Do you want to know what happened to me on those dates, you fucking asshole? I had a miscarriage, and I hope you are really proud of yourself now?" She then ran out of the office. A number of postal employees approached her and discussed the incident, and then one employee accompanied Frankel to her car. Frankel returned to her home.

In the course of this exchange, Lyons maintains that Frankel intentionally struck him on the shoulder. Frankel denies it. Lyons testified that the blow startled him, but it caused no injury, resulted in no bruise, and did not cause him to lose his breath. According to both Lyons and Frankel, this part of the encounter was extremely emotionally charged. Frankel felt violated, was yelling loud enough for her co-workers outside of the office to hear through the closed office door, was weak and trembling, physically shaken, and almost fell down as she left the room. Lyons was upset, stunned, and filled with anxiety. While Frankel has testified that

she did not touch Lyons during that meeting, she believes that she may have come into contact with a vacant chair that was two feet from Lyons and in her path to the door.

This Court has already heard testimony regarding this incident at an evidentiary hearing conducted on February 16, 2000, and March 16, 2000. Testimony was provided by LaCommare, who claimed to have witnessed the events through the office window, Frankel, Lyons, the union steward, and several other minor witnesses. After careful consideration of the substance and credibility of each witness' testimony, the Court found as a matter of law that Lyons reasonably believed that Frankel intentionally struck him, and that he was acting within the scope of his employment when reporting the incident to various Post Office employees including Bombassaro, Ring, Ring's supervisor, the Postal Inspection Service,[6] a Labor Relations specialist, and an Employee Assistance Program employee.[7]

In the afternoon of December 19, 1996, after Lyons had reported the incident to Ring, Ring called Frankel at home and told her that she had been accused of assaulting Lyons and that she was placed on emergency off-duty status without pay. She was forbidden to enter the workplace. While Frankel originally lost her grievance challenging this decision, on January 2, 1997, she appealed that decision as well as other Post Office actions. She ultimately prevailed in an arbitration proceeding and was awarded back pay for the time she missed from work on December 5, 1997.

The arbitrator's decision was based on the finding that the Post Office over-reacted to the seriousness of the December 19, 1996, incident and failed to properly investigate it in a timely fashion. While

---

**6.** Lyons testified that he believed he was required to report the incident to the Postal Inspection Service under the Post Office's policy of "zero tolerance" for violence in the workplace.

**7.** On December 20, 1996, Lyons also discussed the incident with the union steward who had been present at the beginning of the discussion when he asked Lyons about what happened at the meeting.

the arbitrator found that Frankel's conduct on December 19, 1996, was "wrong," it concluded that "[i]t is believed that she was out of control and her actions resulted from the emotional outburst that may have well overwhelmed her."

In late February, two months after the incident and while Frankel was still on off-duty status, the Post Office ordered Frankel to submit to a "fitness for duty" medical evaluation. The evaluation was not scheduled until March 14, 1997.

On March 13, 1997, for the first time, Frankel contacted the EEO counselor at the Post Office. In the "Information for Precomplaint Counseling" form, which Frankel signed on March 20, 1997, Frankel states that the basis for her discrimination claim was that she was "disciplined for sick leave due to a miscarriage."[8]

The "fitness for duty" evaluation was not held until April 4, 1997. It was re-scheduled twice, once at Frankel's request. The evaluation cleared Frankel to return to work that day. However, the Post Office had decided to abolish her position and reassign her to a similar position in another section, though in the same building with the same job description. Frankel refused to accept the reassignment believing that Ring would be her direct supervisor and that the abolition of her job was discriminatory. Accordingly, Frankel instituted a grievance challenging the reassignment. The grievance was settled and the parties agreed "[t]he position was improperly abolished therefore the grievant will be returned to the former position."

On April 10, 1997, the Post Office suspended Frankel for fourteen days for her actions on December 19, 1996. The suspension was to take effect April 26, 1997, but was later reduced to a letter of warning. Frankel received payment of her wages for the fourteen days.

Frankel became pregnant again by early May, and ultimately decided not to return to work.

In her deposition, Frankel testified about general work conditions at the Post Office during her tenure. She stated that: Lyons favored male employees, Lyons had treated Frankel rudely on occasion, Bombassaro had once denied her request for leave to attend a funeral but in the same month granted three days leave for a male employee to attend a funeral. She indicated it was her impression that males in the office received more bonuses and awards than the female employees (even though the female employees worked harder), that males were accorded special treatment with regard to leave, and that males were more frequently permitted to attend to personal issues on work time. Frankel has not produced any Post Office personnel records supporting her impressions.

## II. *LEGAL ANALYSIS*

Frankel's discrimination claims are analyzed under the three part test developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). This is not only true for the sex discrimination claim under Title VII, but also for the FMLA discrimination claim. *Hodgens v. General Dynamics Corp.,* 144 F.3d 151 (1st Cir.1998).

The plaintiff must make out a *prima facie* case, and then the employer must articulate a legitimate, non-discriminatory reason for its actions. *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 15 (1st Cir. 1994). The plaintiff must then produce sufficient evidence for a reasonable jury to infer that the articulated reason was merely a pretext for discrimination, and that

---

8. On June 18, 1997, Frankel filed an official complaint with the EEO office of the Post Office indicating that the basis for discrimination was sex, handicap, and retaliation. In the complaint, Frankel again stated that she was disciplined for taking FMLA leave time.

the employer's actions were motivated by a discriminatory animus. *Id.* at 16. It is the third part of the *McDonnell Douglas* test, producing sufficient evidence for a jury to reasonably infer pretext, at issue in this case. For purposes of this motion, the Post Office does not argue that Frankel cannot make out a *prima facie* case.

Summary judgment is appropriate if the non-moving party rests merely "upon conclusory allegations, improbable inferences, and unsupported speculation." *Byrd v. Ronayne,* 61 F.3d 1026, 1030 (1st Cir.1995) (citations and internal quotation marks omitted). The Post Office argues that Frankel's evidence of pretext is insufficient in that she relies entirely on conclusory allegations, improbable inferences, and unsupported speculation.

### A. *The Prima Facie Case*

To make out a *prima facie* case of discrimination, or retaliation under a discrimination statute, a plaintiff must show: (1) membership in a class protected by the statute (in the case of a retaliation claim, engaging in an activity protected by the statute), (2) an adverse employment action, and (3) a causal link between the membership in a protected class (or protected activity for a retaliation claim) and the employer's adverse action. *See Smith,* 40 F.3d at 15; *Hodgens v. General Dynamics Corp.,* 144 F.3d 151, 161 (1st Cir.1998); *Wyatt v. City of Boston,* 35 F.3d 13, 15 (1st Cir.1994).

### 1. *Frankel is a Member of a Protected Class and Engaged in Protected Activity*

With respect to the sex discrimination claim under Title VII, Frankel is a woman. With respect to the retaliation claim under Title VII, Frankel complained to an EEO Counselor on or about March 13, 1997.[9] With respect to the FMLA discrimination

claim, Frankel took leave time for a serious medical condition. With respect to the FMLA retaliation claim, Frankel complained to the Post Office EEO counselor that she had been disciplined for taking sick leave due to a miscarriage on March 13, 1997.

### 2. *The Adverse Employment Actions*

Frankel argues that five of the Post Office's actions constitute illegal discrimination under either Title VII or the FMLA. They are: (1) Lyons' decision to conduct the "official discussion" with Frankel, (2) Ring's decision to place Frankel on emergency off-duty status without pay on December 19, (3) the February 27 order that Frankel submit to a "fitness for duty" evaluation, (4) the elimination of Frankel's position in her section of the Post Office, and (5) the fourteen day suspension issued on April 10 which was ultimately reduced to a letter of warning.

### 3. *The Causal Link Between the Adverse Employment Actions and Frankel's Membership in a Protected Class*

"The prima facie burden is quite easy to meet." *Hodgens,* 144 F.3d at 165 (internal quotation marks and citations omitted). The causal link can generally be established by the timing of the events at issue. "One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." *Wyatt,* 35 F.3d at 16. At the very least, the adverse employment actions were taken after Frankel engaged in activity protected by the FMLA (taking leave for her miscarriage and opposing discipline for taking the leave). With respect to the sex discrimination claim, the evidence is not as clear.[10] However, the Post Office has

---

9. It is unclear if sex discrimination was complained of at that time from the record before me. Frankel did allege sex discrimination in her EEO complaint dated June 18, 1997.

10. The retaliation claims stand on more solid ground. Two of the challenged actions occurred shortly after Frankel's complaint to the EEO counselor on March 13, 1997.

elected not to challenge Frankel's ability to make out a *prima facie* case, at least for purposes of this motion. Therefore, the Court will focus its attention on the remaining steps of the analysis.

## B. *The Articulated, Legitimate, Non-Discriminatory Reasons*

The Post Office has articulated the following nondiscriminatory reasons for the above actions. First, the Post Office argues that Lyons' decision to have an official discussion with Frankel concerning sick leave was the result of a decision to meet with all employees who had used more sick leave than they had accrued in the previous quarter, and that this decision was made without regard to the sex of the employee or whether that person had exercised rights under the FMLA. Second, the Post Office argues that Frankel's placement on emergency off-duty status was an appropriate response to the alleged assault given Ring's understanding of the Post Office policy of "zero tolerance" for violence in the workplace. Third, the Post Office argues that the medical evaluation was consistent with Post Office policy requiring such evaluations whenever an employee has been absent because of conduct that suggests the employee may be a risk to herself or others. The Post Office argues it was reasonable for Ring to believe Frankel posed such a threat based on his belief that she had assaulted a supervisor. Fourth, the Post Office argues that the decision to eliminate Frankel's position was based on the advice of expert management consultants and the Postal Service Personnel Department. The consultants were hired specifically to determine the most appropriate response to the disruption caused by the events of December 19, 1996. The reason for the fifth adverse employment action (the fourteen day suspension issued for Frankel's conduct on December 19, 1996) was not specifically articulated by the Post Office. However, the Post Office has essentially argued that all of these actions were reasonable responses to Frankel's reported misconduct in light of Post Office policy.

## C. *Sufficient Evidence to Reasonably Infer Pretext*

■ When direct evidence of discrimination is lacking, pretext can be established by circumstantial evidence such as: comments by the employer denigrating members of the protected class, statistics showing disparate treatment by the employer of members of the protected class, the incidence of differential treatment in the workplace, the specific sequence of events leading up to the challenged decision, the historical background of the challenged decision, departures from normal procedures, or even doubts about the fairness of an employer's decision. *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir.1991) (citations omitted); *Hodgens*, 144 F.3d at 168–169 (citations omitted).

### 1. *Sex Discrimination*

■ Frankel has not produced sufficient evidence for a reasonable fact finder to infer that she was discriminated against because of her sex. The "official discussions" of December 19, 1996, were undeniably carried out without regard to an employee's sex. A sex-neutral criteria was used for determining who would receive these discussions and both men and women were selected. Nor is there any evidence that could support an inference that any of the other adverse actions were motivated by a discriminatory animus against women. Frankel has not produced any competent evidence of the type used to prove pretext.

Frankel argues that there were incidences of unequal treatment of men and women in the workplace, but she offers only conclusory allegations, wholly unsupported by the record. First, her impressions that women were not treated equally with respect to bonuses, or with respect to being allowed to attend to personal issues on work time, is not supported by any

evidence in the record.[11] Second, the one specific allegation of disparate treatment of similarly situated individuals—denying Frankel's request for leave to attend a funeral while granting a male employee's request—is completely undermined by Frankel's failure to produce sufficient facts to determine if she actually was similarly situated to the male employee. Frankel claims in her deposition that she and the male employee each sought to attend the funeral of a non-relative. However, she concedes that she does not know any of the other circumstances surrounding the respective requests. While this could conceivably suffice to survive a motion to dismiss, it certainly is not enough at the summary judgment stage. This alone cannot support an inference of pretext absent any other evidence.[12]

Therefore, the Post Office's motion for summary judgment on Frankel's sex discrimination claim is **GRANTED.**

### 2. *FMLA Discrimination*

Frankel claims that she was subject to inappropriate and discriminatory discipline because she took leave covered by the FMLA in violation of 29 U.S.C. § 2615(a)(1) which provides that an employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."

■ As a preliminary matter, Frankel challenges the use of the three part *McDonnell Douglas* test to analyze the claim. Frankel concedes that when the parties dispute the motive of the employer, the *McDonnell Douglas* test is the appropriate form of analysis. *See Hodgens,* 144

F.3d at 160–161. However, Frankel argues that there is no issue of intent here, because the Post Office "must acknowledge that it gave Plaintiff an official discussion concerning her sick time use, and that it would not have done so had Plaintiff not taken FMLA leave."

Frankel confuses intent with causation. It is true that if Frankel had not taken leave time protected by the FMLA, she would not have used more sick leave than she had accrued in that particular quarter—which was the basis for the decision to give the "official discussion." However, this does not establish that the Post Office decided to give her an official discussion *because* she took FMLA protected leave time. It merely establishes that the "official discussion" would not have occurred *but for* her taking the leave time.

■ Frankel's inability to produce any evidence from which a jury could infer pretext or discriminatory animus dooms the claim. Frankel concedes that Lyons had absolutely no idea that Frankel had suffered the miscarriage when he gave her the "official discussion." There simply is no way that the decision to give the "official discussions" was motivated by anything but a desire to control the use of sick leave—regardless of whether the person had taken the sick leave for a serious medical condition, routine illness, or was inappropriately escaping from a day at the office. The only reason for giving the "official discussions" was because those particular employees had used more sick leave than accrued in the previous quarter. It is not the role of the Court to determine whether this was a wise or fair reason for

---

11. Frankel testifies in her deposition that a male employee was allowed to leave work to pick up his son who had fallen at school and scraped his knee. However, Frankel does not set forth any concrete evidence that similarly situated women were treated differently. Frankel testified only that she did not know of any woman who was granted a similar privilege.

12. Frankel supports her allegation that Lyons treated women more rudely than men with a description of a single incident in which Lyons refused to allow Frankel to revise her schedule. In denying the request, Lyons wrote Frankel a rude note. However, Frankel herself describes this conduct as typical of how Lyons treated employees, without respect to an employee's sex.

the decision, simply whether it was a non-discriminatory one.

■ While Lyons' undisputed ignorance of Frankel's miscarriage clearly establishes that the "official discussion" is not a valid basis for an FMLA discrimination claim, each of the remaining challenged adverse actions were taken with full knowledge that Frankel had taken leave time protected by the FMLA. Nonetheless, the claim cannot survive summary judgment. There simply is no basis to infer that any of the four remaining challenged actions were taken because Frankel had taken leave protected by the FMLA, rather than the employer's belief that an assault had occurred.

The FMLA was enacted to provide a "minimum standard for leave." S.Rep. No. 103–3, at 6 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 6. "A central reason that labor standards are necessary is to relieve the competitive pressure placed on responsible employers by employers who act irresponsibly." *Id.* at 7. Essentially, the act was designed to eliminate the economic pressure that prevented employers from offering leave policies that were compatible with the medical needs of families. The Congress considered numerous studies of existing family leave policies which "taken together, indicate that while many employers are providing family and medical leaves to their employees, a significant percentage of employers of all sizes have yet to adopt such policies." *Id.* at 17.

Unlike discrimination statutes seeking to protect a class of persons from the bias of their employers, the FMLA addresses an economic problem. Employers who are pinching pennies in a competitive market might prefer to terminate and replace an employee rather than provide a generous leave policy that will allow the employee to resolve the particular situation and return to work.

I discuss the basic purpose of the FMLA because it places Frankel's argument in context. Since the targeted ani-mus of the FMLA is not an arbitrary form of bias, but an animus derived purely from the prospect of economic loss, it would be completely irrational for the Post Office to take such drastic steps against Frankel (suspension, ordering her to attend a "fitness for duty" evaluation, etc . . .) simply because she suffered a miscarriage and missed a few days of work. This is especially true in this case where Frankel had accrued sufficient unused sick leave to cover her absences without resorting to the protection of the FMLA. In other words, Frankel's brief leave did not even approach the type of economic threat to the employer contemplated by the drafters of the FMLA. This is not to say that an employee cannot maintain an FMLA claim when the cost of compliance with the FMLA is minimal, but that in cases such as this one, where there is nothing in the record to indicate that the employer was motivated by the employee's taking of leave protected by the FMLA, the claim cannot survive.

Each of the other challenged actions cannot plausibly be explained as a response to Frankel's November absences because of her miscarriage. The decision to suspend her the day of the "official discussion" was clearly a response to Frankel's reported behavior on that day. Ring made the decision to suspend her after Lyons reported that she had struck him and cursed at him. Ring had no reason to doubt Lyons' word. Ring decided the suspension was appropriate given a "zero tolerance" policy for violence in the Post Office workplace. The suspension may have been unfair, or even excessive, but it certainly was not because she had taken leave time protected by the FMLA.

None of the other challenged actions occurred close enough in time to her absences to support an inference that they were motivated by her having taken the leave time. The next challenged action, the "fitness-for-duty" evaluation, occurred three months later, in late February. At that late date, it is completely illogical that

the Post Office would take action against her because of absences dating back to November. The other challenged conduct did not occur until April, and also cannot support an inference that would rescue the claim from summary judgment. Therefore, Defendant's motion for summary judgment with respect to the FMLA discrimination claim is **GRANTED.**

### 3. Retaliation Claims

#### a. March 13, 1997, Opposition

■ While there is no basis to infer that the Post Office's challenged conduct was motivated by Frankel's *use* of leave time protected by the FMLA, it is possible that the challenged conduct was motivated by Frankel's *opposition* to her discipline. Both Title VII and the FMLA have a provision to protect employees from retaliation for protesting actions believed to violate the underlying statute.[13] These provisions forbid discrimination against employees "for attempting to protest or correct allegedly discriminatory conditions of employment." *McDonnell Douglas,* 411 U.S. at 796, 93 S.Ct. 1817.

Frankel first complained to the EEO counselor on March 13, 1997. In is unclear if she complained of sex discrimination at that time, but she did state in the "Information for Precomplaint Counseling" form that she was disciplined for "sick leave due to a miscarriage." On April 4, 1997, just three weeks after her initial contact with the EEO counselor, her position was eliminated and she was reassigned to another section in the Post Office. This was the same day she was cleared to return to work by the "fitness for duty" evaluation. Frankel grieved this action and the parties settled agreeing that her position "was improperly abolished therefore the grievant will be returned to the former position."

On April 10, 1997, less than one week after the termination and reassignment, Frankel was suspended for her conduct on

December 19, 1996. She had already been placed on emergency off-duty status without pay for approximately three months at the time the suspension was issued. The Post Office ultimately changed the suspension to a letter of warning and provided compensation for the two weeks.

Each of these actions were taken shortly after Frankel complained to the EEO counselor. Each of these actions were ultimately withdrawn or modified. The Post Office agreed that the elimination of Frankel's position was "improper." The suspension followed a three month period in which Frankel was placed on emergency off-duty leave without pay—an action ultimately found improper in arbitration. To remove Frankel from work for an additional two weeks without pay is arguably excessive. Whether the Post Office's excessive discipline was motivated by Frankel's contact with the EEO counselor is by no means clear from the record. However, (1) the timing of these actions, (2) the excessive nature of the discipline, (3) the Post Office's agreement that one action was improper, and (4) the Post Office's voluntary abandonment of the other, taken together, provide a sufficient basis for a reasonable jury to determine that the actions were retaliatory.

#### b. Opposition Prior to March 13, 1997

■ Frankel also argues that the decision to place her on off-duty status on December 19, 1996, and the order to submit to a "fitness for duty" evaluation were made in retaliation for Frankel's "complaint" of improper discipline during the "official discussion." Assuming only *arguendo* that Frankel's conduct on December 19, 1996, could be characterized as opposition to a practice that she believed was in violation of the FMLA, there is no basis from which a jury could infer that the motivation for the employer's various actions was to retaliate against Frankel for her "opposition" on that particular day:

13. *See supra* n. 2; S.Rep. No. 103–3 at 36.

Ring made the decision to place Frankel on emergency off-duty status because Lyons reported that he had been assaulted by her. Even if the response were excessive, there is no reason to believe that the action was taken for any other reason. There is absolutely no evidence that Lyons ever intended to report Frankel to Ring until after she swore at him and allegedly intentionally struck him. Each employee who received an "official discussion" protested, but no actions were taken against them. While Frankel did call for a union steward, there is no evidence in the record that Lyons intended to report her to Ring even after the union steward left the office to file a grievance. The decision to place her on off-duty emergency status only came after Frankel's outburst and reported assault. It was not a form of retaliation, and no reasonable jury could find otherwise.

However, while the original decision to remove Frankel from the workplace was indisputably a response to the reported assault, the length of that "emergency" off-duty status (from December 19, 1996 to April 4, 1997), and the amount of time that elapsed between that decision and the order to submit to a medical evaluation (from December 19, 1996 to late February of 1997), appear as unjustifiably excessive as were the Post Office's disciplinary actions taken after Frankel complained to the EEO Counselor. Indeed, the arbitrator found the Post Office's actions excessive and that the investigation proceeded too slowly.

Thus, even though there is nothing in the record to indicate that the Post Office's excessive discipline and delay was motivated by Frankel's protest on December 19, 1996, a jury could reasonably infer that the excessive discipline and delay thereafter stemmed from Frankel's appeal of her grievance on January 2, 1997. The lack of a more thorough investigation prior to January 2 (which should have included a medical evaluation if Post Office policy did actually call for such an evaluation) is un-

derstandable given that only two weeks had passed, and much of that time was during the holidays. However, the fact that no further action was taken until late February could support a jury inference that the Post Office was stonewalling in retaliation for Frankel's decision to press her grievance against the Post Office's actions. Therefore, insofar as the FMLA retaliation claim attacks the length of the emergency off-duty status, as well as the order to submit to a medical evaluation in late February, they too survive summary judgment. However, the original decision to suspend Frankel cannot support a retaliation claim.

### III. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment on the Title VII and FMLA discrimination claims is **GRANTED**; and Defendant's motion for summary judgment on the FMLA and Title VII retaliation claims is **DENIED** only with respect to the specific aspects of the challenged conduct identified by the Court.

**SO ORDERED.**