Pierce v. Alice Peck Day, et al.     CV-00-318-M    03/11/02

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Ruth Pierce,
        Plaintiff

        v.                                      Civil No. 00-318-M
                                                Opinion No. 2002 DNH 058
Alice Peck Day Memorial Hospital,
and Jane Doe(s),
        Defendants


**O R D E R**


Plaintiff, Ruth Pierce, brings this action for damages under the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, et seq., asserting that her former employer, Alice Peck Day Memorial Hospital ("APD" or the "hospital"), interfered with her medical leave rights and later retaliated against her for exercising those rights.  APD denies those allegations, and has moved for summary judgment.  Plaintiff objects.


**Relevant Facts**

Plaintiff served as the hospital's medical laboratory manager from February of 1992 until just before she resigned under pressure on October 7, 1998.  The hospital does not contest the fact that Pierce's resignation was in lieu of termination.

Had she not resigned, she would have been fired, and the hospital seems to concede that circumstance amounts to an "adverse" employment action. By resigning, Pierce obtained some benefits that otherwise would have been unavailable, like severance pay. Pierce says she was first "demoted," and eventually forced out, for one reason: she took two weeks of FMLA leave in July of 1998 to care for her terminally ill father.

The evidence offered by the parties on summary judgment reveals that in January of 1998, about eight months before Pierce took the two week leave at issue, Pierce's supervisor, Flora Meyer, Vice-President of Clinical Services at the hospital, met with Pierce, and others, to discuss the laboratory's operation and future reorganization. Meyer's contemporaneous memorandum of that meeting (Exhibit A, Def. Motion for Sum. Judg.) is at least indirectly critical of Pierce's management, and plainly discloses an intent to both reorganize the laboratory's staffing, and improve what Meyer deemed to be its unsatisfactory performance:

> I stated that I realized this is a difficult period but
> it was essential to develop a vision, and implement the
> plan. What we tend to do in the Lab is to mold
> functions around the individuals in the Lab. Sometimes
> this leads to situations whereby the main business of

2

the Lab is unable to be accomplished.  We are at a pivotal time within the Lab.  We are beginning an install with the Meditech Computer System, we have hired a substantial number of new staff, and we have implemented many new systems within the Lab.  If we reorganize the Lab and we don't have the right personnel then we will need to hire staff able to perform the functions.  Presently, we lack systems, we are unable to respond to the requests of our customers, and we do not have the personnel with outlined descriptions in place to perform the work.

Today, I met with Ruth [Pierce] and we discussed a timeline for accomplishing the following projects:

*** 

3.  I acknowledged my awareness of Ruth's reluctance but I stressed that the situation in the Lab would not get better on its own and we must take steps to insure the smooth functioning of the Lab.

Soon thereafter, during the spring, Pierce was faulted for failing to develop or assign new "CPT codes" for services performed by the laboratory in a timely fashion.  Without a correct and comprehensive coding system, the hospital was unable to completely and accurately bill for its laboratory services.  Although Pierce offered explanations for her failure to do what was required in a timely manner (she suggested difficulty in obtaining a necessary manual from the hospital's MIS department), it is evident that her employer was dissatisfied.

3

In June of 1998, Pierce took a two week vacation. Upon her return, she made it generally known that her father was seriously ill and that she would be away from work and in Florida during the first two weeks of August to care for him. Meyer says Pierce's disclosure was slightly different - that her father was seriously ill and she would be away "to be with him." But it was reasonably clear to Meyer and senior staff (e.g., the hospital's president and the laboratory's medical director) that Pierce would be leaving for two weeks in August due to her father's serious illness, and not simply for a personal "vacation," in the ordinary meaning of that term.

Although Pierce was planning to be away for reasons covered by the FMLA, and admits that she was familiar with hospital policies regarding such leave, she did not comply with those policies. She did not submit a request form or file a certification of need, as required. See Def. Exhibit E; Def. Exhibit C (Pierce Dep.), pp. 50-52, 58. On the other hand, the policies governing FMLA leave appear not to have been strictly enforced with respect to managers, like Pierce. She effectively controlled her own schedule, within broad limits. The time

4

Pierce spent with her father was accounted for by the hospital as use of "earned leave" (or "vacation" time). That would also have been the case if Pierce's absence had been formally accounted for by the hospital as FMLA leave. That is to say, "employees who had available 'earned time' (accrued vacation or sick time) were required to use it when out on FMLA leave." Plaintiff's Memorandum of Law (document no. 8) p. 8.

No one at APD raised any question or issue regarding Pierce's intent to spend two weeks with her ill father, and no one directly discouraged her from doing so, or objected in any way. And, upon Pierce's return, no one at APD directly questioned, raised an issue about, or objected to her having taken time to be with her father.

On July 31, the last work day before Pierce was to leave for Florida, Meyer spoke to her about administrative changes under consideration and likely to be acted upon while she was away. Meyer told Pierce that APD was going to bring in an "Administrative Director" to oversee the laboratory (Pierce's title was Laboratory Manager, while a physician, Dr. Suellen

5

Ballestra, served as the laboratory's Medical Director). Meyer also told Pierce that her role would likely change (she would no longer be the manager). Pierce was given a new title of Acting Laboratory Supervisor.

By that time, APD and Meyer had already been talking to Cathy Donovan, a consultant, whom they hoped to enlist in the effort to restructure the laboratory's management and operation. The record makes clear that Pierce was not seen by Meyer as the single problem in the laboratory; there were other existing personnel and performance problems causing Meyer concern, and it is evident that she was determined to change the laboratory's organizational structure and functioning to insure that its operation improved in the future. See, e.g., Pl. Exhibit G.

A week or so later, Meyer called Pierce in Florida to tell her that Donovan was joining the staff as the new Administrative Director of the laboratory and that Pierce would be subordinate to her. Pierce's duties and pay were not altered. Meyer later informed the laboratory staff that, upon her return, Pierce would be serving as Acting Supervisor and would report to Donovan.

6

Pierce returned from Florida on August 17. She was unhappy to learn that Meyer had already announced the staffing change. At a staff meeting shortly thereafter, among Pierce, Meyer and Donovan, Meyer made a disparaging comment referring to Pierce's time with her father as "vacation." Pierce does not state with any precision just what was said, but asserts the "vacation remark" was "caustic and sarcastic." Pl. Exhibit E, Aff. of Pierce. Meyer agrees she referred to Pierce's time away as "vacation," but says it was not sarcastic, and she genuinely thought Pierce was on vacation. Def. Suppl. to Exhibit B (Meyer Dep.), pp. 163-64.

Ms. Donovan actually joined the staff in August, albeit seemingly as an independent contractor or consultant, and began reviewing laboratory operations on August 25. It is not apparent that she assumed the title or functioned as "Administrative Director" of the laboratory while Pierce worked for the hospital. Meyer, at least, anticipated that Pierce might find those changes unacceptable, and would resign. See Plaintiff's Memorandum of Law, (document no. 8) at 10; Pl. Exhibit G.

7

Within a few weeks, Donovan identified a number of problems or issues that required attention, some reasonably serious. She was particularly concerned about an apparent failure to properly record (and possibly perform) microbiology quality control tests, which are used to insure that work performed by the medical laboratory for the benefit of hospital patients is reliable. The logs in which the results of quality control tests were supposed to be recorded were, "for the most part, blank" for July and August of 1998. Def. Exhibit G (Donovan Deposition), p. 100. The quality control tests had in fact been performed, but the results were improperly recorded elsewhere, which made it impractical to use them to insure that pertinent laboratory tests were reliable. Additionally, Donovan noted that the blood bank quality control data (refrigerator temperature fluctuations and maintenance) had not been done or recorded in April and part of June of 1998. Def. Exhibit G, pp. 113-114. That deficiency also raised what she considered serious issues of patient safety.

Donovan reported these and other matters to Meyer by memo dated September 10, 1998, titled "Laboratory Service Improvement Project Recommendations." Def. Exhibit I. Meyer promptly

8

incorporated Donovan's recommendations into a letter dated September 11, 1998, to Pierce. Def. Exhibit J. Stressing that "all quality control logs and unscheduled maintenance must be reviewed according to procedure," and "failure to record or perform quality control and maintenance procedures must be addressed promptly," Meyer imposed a two week deadline for Pierce to correct the deficiencies outlined by Donovan and to implement the recommendations in Donovan's report. Pierce was also told to personally review the quality control logs daily, to assure that data were properly recorded. The deadline was later extended by an additional week, but Pierce failed to accomplish all listed tasks. Some items on the list were serious matters, but others were not necessarily critical, and some probably could not be fully completed in the specified time through reasonable diligence. Nevertheless, the hospital and Meyer did expect a concerted effort and a quick turnaround, offered to provide help to Pierce, and were apparently dissatisfied with not only the results Pierce produced, but by her attitude as well.

After she was given the list of deficiencies to correct, developed by Donovan and passed along by Meyer, Pierce complained

9

to the hospital's Director of Human Resources, Donna (Cramer) Shay. She complained about being "harassed," by constant communication (presumably from Meyer, Donovan, and Dr. Ballestra) about the laboratory's operation, particularly issuance of the September 11 list of deficiencies. Pierce says, in an undated affidavit, that she also told Shay that, in her view, the alleged harassment resulted in part from her having taken FMLA leave. Pl. Exhibit E. Shay investigated Pierce's complaint, and concluded that it was without merit:

> Ruth - I have investigated your concern of harassment which we discussed last week. I have spoken with Flora [Myer], Cathy [Donovan] and [Dr.] Suellen [Ballestra] and have reviewed data to evaluate the reasoning for their constant communication (verbally and written) with you regarding the laboratory. I have found that there are major issues in the laboratory, which are affecting patient care, that have not been resolved and have been ongoing for quite some time.
>
> At this time I see their communication as a mandatory necessity and as a responsibility of their positions to follow-up on identified deficiencies in the laboratory for which you are responsible.

Def. Exhibit M. Shay also advised Pierce of her right to pursue her grievance to the "next step," by contacting Mesropian, the hospital's President. Pierce did not take that step.

10

Although she had been given an imposing list of deficiencies to correct in the hospital laboratory she managed, and despite having been directly ordered by her supervisor to personally check the laboratory's quality control logs each day to insure that they were properly completed, Pierce declined or failed to check the records as directed. Pierce says the order was actually one to "sign the quality control documents for the lab's microbiology function" (Pl. Exhibit E, ¶ 14), and implies (but does not say) that she refused because the directive was "illegal," as she was not qualified to attest to the results. (Why she did not make that point to Meyer when the directive was given is not addressed.) In either event, however, Pierce did not do what Meyer told her to do.[1]

---

[1] Assuming Pierce's implied version of the directive is correct – that she refused to perform an unlawful job assignment – she may have grounds to argue that any discharge based on that refusal might constitute a wrongful discharge under New Hampshire's common law, as public policy would support her refusal to do something "illegal." See Cloutier v. A & P Tea Co., Inc., 121 N.H. 915 (1981). But the question here is not whether the employer was correct, or even fair, in taking the action it did. The question here is whether, in taking the adverse personnel actions complained of, the employer had an impermissible retaliatory motive related to Pierce's having taken FMLA leave, or whether it was motivated by legitimate job performance assessments. If the reasons for APD's action were not FMLA related, then the FMLA retaliation claim necessarily fails.

11

APD says that because Pierce did not do as instructed, some glucose tests were released at a time when quality control measures were not demonstrably reliable (a patient safety issue), which would not have happened had Pierce done as directed. The hospital also says that based on that failure, in the overall context of her deteriorating performance since January, and Meyer's determination to restructure the laboratory, it was decided by Meyer and others in authority (including Dr. Ballestra, Donovan, Shay, and APD's President, Robert Mesropian) that Pierce was not, and had not been, managing the medical laboratory in the manner desired and should leave. Def. Suppl. to Exhibit B (Meyer Dep.) (document no. 23) at 165. Accordingly, Pierce was offered the option of resigning with severance benefits, or being fired. Pierce submitted her resignation, effective October 7, 1998.

## Discussion

An employee is generally entitled under the FMLA to take up to 12 weeks of leave to care for a close family member with a serious health condition. 29 U.S.C. § 2612(a)(1)(C). An employer may not interfere with, restrain, or deny the exercise

12

by employees of the rights conferred by the FMLA, and may not discriminate against an employee for having exercised those rights.  29 U.S.C. § 2615(a)(1) and (2); see generally Hodgens v. General Dynamics Corp., 144 F.3d 151, 159-60 (1st Cir. 1998). "Nor may employers 'use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." Hodgens, 144 F.3d at 160 (quoting 29 C.F.R. § 825.220(c)).

In this case, Pierce claims that APD did just that - discriminated against her for taking qualifying FMLA leave by demoting her to Acting Laboratory Supervisor on the day she left to care for her father, and by forcing her resignation some six weeks after she returned.[2]  "In such a case, the employer's

_____

[2] APD does not urge the point, probably because in the end it is somewhat circular, but it should be noted that Pierce resigned; she was not fired.  Resignations are generally presumed to be voluntary, absent some evidence of duress or coercion.  An employee confronted with the option of resigning or being fired "for cause" has not been "forced" to resign.  See, e.g., Alvarado v. Picur, 859 F.2d 448 (7th Cir. 1988); Christie v. United States, 518 F.2d 584 (Ct. Cl. 1975).  To demonstrate coercion, an employee must show that the employer did not believe that the "for cause" basis for threatening discharge was founded.  See Marshall v. Golfview Development Center, Inc., 2001 WL 648628 (N.D.Ill. 2001).  In substance, that is what Pierce is probably asserting, when she argues that APD's explanation was pretextual for FMLA discrimination - that APD did not believe that "cause"

13

motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." Id. The "tricky issue of motivation" is analyzed under the familiar McDonnell Douglas framework of shifting burdens, as, in this case, there is no direct evidence of discrimination. Hodgens, 144 F.3d at 160. See generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973).

APD seeks summary judgment, arguing that there is no genuine issue as to any material fact that would preclude judgment in its favor, and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 59(c). Unless the party opposing summary judgment (here, Pierce) presents evidence sufficient to permit a jury to return a verdict in her favor, there is no triable issue. "If the evidence [supporting Pierce] is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). An issue of material fact is genuine if "the evidence relevant to the issue, viewed in the light most

existed to threaten discharge and actually was motivated by an intent to retaliate for her having taken leave.

14

flattering to the party opposing the motion, [is] sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)(citations omitted).

Generally, on summary judgment, "the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996). But, the McDonnell Douglas framework is a helpful explanatory, as well as analytical tool, and although strict adherence is not usually required in resolving summary judgment motions, its use can sometimes go a long way in avoiding later confusion. See, e.g., Smith v. F. W. Morse & Co., Inc., 76 F.3d 413, 429-36 (1st Cir. 1996)(Bownes, J., concurring). Accordingly, the court will employ that framework here.

15

The court of appeals for this circuit considered similar FMLA issues in <u>Hodgens</u>, <u>supra</u>, describing and applying the <u>McDonnell Douglas</u> framework in some detail, as follows:

> <u>McDonnell Douglass</u> allocates the burdens of production and persuasion in accordance with a three-step procedure.  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802-04, 93 S.Ct. 1817.  Under that framework, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation.  <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817, <u>see</u> <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).  If he does so, then the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's [termination]," sufficient to raise a genuine issue of fact as to whether it discriminated against the employee.  <u>McDonnell Douglas</u>, 411 U.S. at 802, 93 S.Ct. 1817; <u>see</u> <u>Burdine</u>, 450 U.S. at 253, 101 S.Ct. 1089.  The employer "must clearly set forth, through the introduction of admissible evidence, the reasons for the [employee's termination].  The explanation provided must be legally sufficient to justify a judgment for the [employer]."  <u>Burdine</u>, 450 U.S. at 255, 101 S.Ct. 1089.  If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave.  <u>McDonnell Douglas</u>, at 804, 93 S.Ct. 1817; <u>Burdine</u>, 450 U.S. at 257, 101 S.Ct. 1089; <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407(1993).  While a satisfactory evidentiary explanation by the employer for its actions destroys the legally mandatory inference of discrimination arising from the employee's prima facie case, the evidence and inferences that

16

> properly can be drawn from the evidence presented
> during the employee's prima facie case may be
> considered in determining whether the employer's
> explanation is pretextual.  Hicks, 509 U.S. at 511, 113
> S.Ct. 2742.

Hodgens, at 160 - 61.

The first step, then, is to determine whether Pierce has established a prima facie case.  APD says she has not, because she is light on proof that her presence was "needed to care for" her seriously ill father, and because she did not follow hospital policies applicable to FMLA leave.  So, APD argues, she has not established that the leave qualified for protection under the FMLA.  APD also asserts that Pierce has not established any causal connection between her two week absence and either her alleged demotion, or her forced resignation.

The prima facie burden is "quite easy to meet," Villanueva v. Wellesley College, 930 F.2d 124, 127 (1st Cir. 1991), and all inferences must be taken in the light most favorable to Pierce, the party opposing summary judgment.  Pierce has met her initial burden.  After all, it is, or should be, self-evident that Pierce's situation is precisely what Congress intended to address

17

in providing protection to employees requiring time away from the job in order to attend to seriously ill family members. APD does not seriously contest that Pierce's father was quite ill (he suffered from terminal emphysema), or that FMLA leave was available for the asking under the circumstances. Instead, APD claims that the leave was technically not "protected" (hence no retaliation claim can lie) because Pierce failed to "apply" for it, or failed to establish that her presence was "needed to care for" her father, or because she failed to provide adequate "certification" of the need for her presence "to care for" her dying father, as called for under the hospital's policies.

None of those arguments carries much weight. Giving Pierce the benefit of every favorable inference, the court will assume that her two week leave qualified for protection under the FMLA, that her employer had adequate notice that she was exercising FMLA rights, that her employer could easily have inquired if it desired more information or wanted its policies complied with in advance of leave, that adverse action was taken with regard to her employment, and that the temporal proximity of her leave and the adverse employment action is at least sufficient to imply a

causal connection for purposes of establishing a prima facie case.  See, e.g., 29 C.F.R. § 825.303; Williams v. Shenango, Inc., 986 F.Supp. 309, 320 (W.D.Pa. 1997)(employees need not expressly invoke the "FMLA" and employers must inquire of the employee if additional information is desired).

Accordingly, the burden shifts to APD, the employer, to articulate some legitimate nondiscriminatory reason for the adverse employment action(s) it took, sufficient to raise a genuine issue of material fact as to whether it discriminated against Pierce based on her exercise of rights under the FMLA.

APD has indeed articulated legitimate nondiscriminatory reasons for bringing in a laboratory director over Pierce, changing Pierce's title to Acting Supervisor, and later asking for her resignation.  APD says Pierce was demoted/forced out because she did not perform up to standards, and had not done so for a period extending back to early 1998 – well before she ever even mentioned leaving to tend to her ill father.  APD supports its articulated reasons for taking adverse action by pointing to: 1) its long-standing dissatisfaction with and plans to reorganize

19

the staff structure and operation of the laboratory, well before FMLA leave was taken; 2) that it had been soliciting Donovan (an expert in medical laboratory operations) to join the staff to assist in revamping, and to take over supervision of the laboratory, again, before Pierce took FMLA leave; 3) that the numerous deficiencies in the laboratory's operation discovered by Donovan, after Pierce's return, were objectively serious issues, implicating patient safety; 4) that Pierce's refusal to do as she was directed with regard to personally inspecting quality control logs on a daily basis after her return, and after relevant deficiencies were pointed out to her, amounted to insubordination; and 5) that Pierce's unsatisfactory progress toward rectifying identified deficiencies in the laboratory, as described in Meyer's September 11 memorandum, was unacceptable to it.

APD's explanation, and supporting evidence, satisfies its burden under McDonnell Douglas. That explanation – Pierce's unacceptable performance and APD's long-standing dissatisfaction with her management and the laboratory's operation, as well as its plans to reorganize the laboratory – raises a genuine issue

of fact as to whether APD discriminated against Pierce because she took two weeks of FMLA protected leave. APD's explanation is also legally sufficient to justify the hospital's decision to subordinate Pierce to Donovan, and, later, to ask for Pierce's resignation.

Thus, the burden shifts back to Pierce. The presumption of discrimination drops from the case, and Pierce must present evidence from which a reasonable jury could find by a preponderance that the hospital's stated reasons for its actions were in fact pretextual for retaliating against her. Of course, the evidence presented by Pierce in meeting her initial prima facie burden, and any supportive inferences to be drawn from that evidence, may be considered in determining whether the hospital's explanation is pretextual for FMLA discrimination.

As recognized by the court of appeals in Hodgens, decisions to grant or deny summary judgment in cases like this are fact-based. Hodgens, 144 F.3d at 168. "In each case, the issue [is] a factual question of motivation: could a reasonable jury find that the adverse action was taken because of the employee's

protected conduct rather than because of other nondiscriminatory reasons?" Id. A plaintiff can meet his or her burden to demonstrate pretext directly or indirectly. Here the parties agree there is no direct evidence of pretext for FMLA discrimination.[3] See, e.g., Plaintiff's Memorandum of Law (document no. 7) at 20 ("While standing alone the comment [by Meyer] may not have been sufficient to establish discriminatory intent . . . .") Nevertheless, Pierce says there is sufficient evidence to indirectly establish pretext.

Pierce argues first that the hospital's asserted grounds for demoting her and forcing her resignation were weak, inconsistent, contradictory, and unsupported, all of which would entitle a jury to both discredit those explanations and infer that, in fact, the hospital removed her because she took two weeks of protected FMLA leave. Pierce also points to the close temporal proximity between her having taken FMLA leave and the adverse employment

---

[3] "Evidence is considered to be direct if 'it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'" Kirk v. Hitchcock Clinic, 261 F.3d 75, 79 (1st Cir. 2001) (quoting Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000)). There are no statements, bearing "squarely on the contested employment decision," though Meyer's "vacation" comment could reflect a degree of animus.

actions, arguing that a jury could infer from that juxtaposition, and the weak explanation given by the hospital, that its motive was in fact discriminatory. She adds that the overall unfair context of the "harassment" she endured from her supervisor and others in authority over her, in combination with the factors identified above, and particularly in light of the revealing comment made by her direct supervisor, Meyer (in which she allegedly referred disparagingly to Pierce's time with her ill father as "vacation"), all add up to a demonstration of pretext sufficient to avoid summary judgment.

"In determining whether plaintiff's allegations meet the burden of proving discrimination for purposes of summary judgment, this court must consider a number of factors, including 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation was false and any other evidence that supports the employer's case and that properly may be considered on a motion for [summary] judgment.'" Benham v. Lenox Sav. Bank, 118 F.Supp.2d 132, 144 (D.Mass. 2000) (quoting Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148-49 (2000)). "[I]f the plaintiff create[s] only a weak

23

issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted evidence that no discrimination had occurred," then the employer would be entitled to judgment. Reeves, 530 U.S. at 148. The dispositive issue, then, is whether Pierce has "produced sufficient evidence for a rational jury to conclude that those reasons [given by the hospital] were a pretext for discrimination" in violation of the FMLA. Hodgens, 144 F.3d at 169.

On the record presented, the court concludes that a rational jury could not find that APD took the adverse employment actions Pierce complains about because she took two weeks of FMLA protected leave in August of 1998. While plaintiff's counsel has done a commendable job in marshaling what little evidence exists, and has constructed as good an inferential argument as can be made of it, in the end there is simply too little there. Under current summary judgment practice, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477

24

U.S. 242, 249-50 (1986)(citations omitted).  "To satisfy the criterion of trialworthiness, and thereby forestall summary judgment, an issue must be "genuine," that is, the evidence relevant to the issue, viewed in the light most flattering to the party opposing the motion, must be sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side."  National Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)(citations omitted).

Here, the only evidence proffered by Pierce that might serve to undermine the well-supported nondiscriminatory explanation given by the hospital is: 1) Pierce took protected leave contemporaneously with the adverse personnel actions (change in status as she embarked on leave, and forced resignation within 6 weeks of returning); and 2) Pierce's supervisor, Meyer, made a disparaging remark at a meeting shortly after Pierce returned to work in which she referred to her time away as "vacation."

The temporal relationship between adverse employment action(s) and FMLA leave can certainly give rise to an inference of discriminatory motive, as can stray remarks made by decision-

25

makers.  But, not a very strong inference arises in this case, given the overall circumstances established by the record.

No one in authority objected to, or expressed displeasure when Pierce said she was going to be away for two weeks to be with her father.  Pierce openly disclosed her intent and purpose to a number of people, including the hospital's president, none of whom reacted negatively.  Well before Pierce took leave, Meyer had made it reasonably clear to her that she was not pleased with the laboratory's operation, that it would be restructured, and that change was in the offing.  Indeed, Meyer had been considering substantive changes in the laboratory since at least January of 1998, and had also communicated her own and the hospital's unhappiness with Pierce's work performance in several areas, well before Pierce communicated her intent to take two weeks leave to care for her father.  The hospital had also been in the process of bringing in Donovan to fully assess both the laboratory's known and suspected deficiencies and needs before Pierce took leave.  Consequently, while it might not be entirely fair to characterize Pierce's career at the hospital as being on a "downward tragectory," see Keeler v. Putnam Fid. Trust Co.,

26

238 F.3d 5, 10 (1st Cir. 2001), the record evidence paints an unmistakable picture of ongoing concern with both Pierce's and the laboratory's performance, and a perception that the quality of Pierce's work was deteriorating.

Nothing in the record, other than temporal proximity, suggests that the decisions to revamp the laboratory, bring in Donovan as Administrative Director/consultant, or to later ask for Pierce's resignation, were related to her having been away for a modest period of two weeks. Indeed, it hardly seems plausible on this record that APD would go to such expensive lengths (planning for reorganization, hiring a consultant, undertaking substantial management information system changes, and identifying serious deficiencies in the laboratory's functioning), simply to cover a retaliatory effort to remove Pierce. See, e.g., Frankel v. U.S. Postal Service, 96 F.Supp. 2d 19, 26-28 (D. Mass. 2000).

There is, of course, the unspecific disparaging "vacation" remark by Meyer upon Pierce's return. The comment would perhaps have more force as an indicator of employer hostility to FMLA

leave sufficient to warrant an inference of retaliatory motive if the evidence of record showed that Meyer actually appreciated that Pierce was on FMLA leave, rather than simply away on earned leave (as Meyer claims). Pierce's leave may well have qualified for FMLA protection, but she herself concedes that she never designated it as such until well after she returned – she never observed any of the formalities associated with taking FMLA leave under the hospital's policies, and there is no evidence that she ever referred to her time away "FMLA Leave" before she left or before Meyer's comment. Def. Exhibit C (Pierce Dep.) at 50-52, 58, 60. There is no apparent reason why Meyer, or Dr. Ballestra, or anyone else not schooled in employment law, human resources, or personnel administration, would have readily drawn the conclusion that Pierce was taking "FMLA leave," as opposed to earned time, sick time, or other entitled absence. But, even assuming Meyer was conscious of the unspoken fact that Pierce was "on FMLA leave" for two weeks, and, so, made a comment revealing animus toward that kind of leave, that single stray disparaging remark, even in combination with the temporal proximity noted above, could not support a jury verdict in Pierce's favor on the

issue of discriminatory motive, given the weak evidence offered to establish the falsity of APD's explanation.

Essentially, Pierce attempts to attack the hospital's nondiscriminatory explanation as false by constructing a theory of what she calls "manipulation" by Meyer — manipulation designed to get rid of her for reasons unrelated to her job performance (and, inferentially, because she took FMLA leave). The record certainly makes clear that by October of 1998, Meyer had decided that Pierce had to go. By that time, however, Donovan had identified a host of unacceptable deficiencies in the laboratory's operation (for which Pierce was responsible), and, Pierce had not made satisfactory progress on the list of remedial measures the hospital (not just Meyer, but Donovan and Dr. Ballestra, as well) wanted accomplished, and, Pierce had acted in an insubordinate manner in refusing to personally check (or sign) the laboratory's quality control logs on a daily basis, as she was instructed to do (and after serious errors had occurred which Pierce's personal daily attention was intended to correct). See, e.g., Def. Suppl. to Exhibit B (Meyer Dep.) (document no. 23) at

158, 167; Def. Suppl. to Exhibit G (Donovan Dep.) (document no. 23) at 149-150.

Those considerations, along with Pierce's deteriorating performance since January, including her past problems in implementing the billing code system, all combined against her, but because she was not performing in a manner acceptable to her employer, not because she took a modest two week leave to be with her seriously ill father.

Meyer may well have envisioned Pierce's departure (she predicted, erroneously, that Pierce would not accept the changes in store for the lab, and would resign rather than accept those changes), and Meyer may well have been intending that result, but nothing substantial in this record suggests that she was motivated by Pierce's having taken two weeks of FMLA protected leave. The evidence presented by Pierce simply does not go very far in establishing that Meyer's performance-related explanation was untrue.

Pierce does not disagree that Meyer was displeased with her performance and the laboratory's operation long before FMLA leave became an issue, and does not seriously challenge the existence of the deficiencies identified by Donovan, or that she failed to carry out Meyer's directives regarding the quality control logs. On this record, a rational jury could not conclude, by a preponderance of the evidence, that APD asked for and obtained Pierce's resignation on account of her having taken two weeks of leave protected by the FMLA, nor could it conclude that the reasons given by APD for its decisions relative to the laboratory and Pierce were false.

The decision to offer Pierce an opportunity to resign in lieu of discharge was a joint one; it was not Meyer's decision alone, and Meyer was not the only person in authority aware of the deficiencies in performance leading to the "demotion" and forced resignation. See Def. Suppl. to Exhibit B, (document no. 23) (Meyer Dep.) at 165-66. For Pierce's speculative theory to have any credence at all, she would have to also claim that Donovan (the consultant) and Dr. Ballestra (the lab's Medical Director), and Shay (Human Resources), and Mesropian (the

31

hospital's president) were all conspirators in an effort to fabricate "cause," and to demote and force Pierce out <u>because she took two weeks of FMLA leave in August of 1998</u>, and that a jury could infer that was so, given her "rebuttal" of the proffered reasons for the adverse personnel action. There is no evidence supporting such a theory. Nothing, for example suggests that Dr. Ballestra or Donovan trumped up fake laboratory deficiencies in an effort to cover up some plot to retaliate against Pierce because she was on FMLA leave. Nothing suggests that Mesropian played any such role. Pierce really only complains about Meyer – she does not argue that anyone else involved in the decision making was acting with a discriminatory motive.

Indeed, when Pierce complained about being "harassed" upon her return from leave, due to constant communications and demands related to the laboratory's operation, Shay, who worked in the Human Resources Department and was not involved in management of the laboratory, investigated the matter. She concluded that Pierce's supervisors had good reason to think the laboratory and Pierce were performing poorly, and that they were professionally obligated to continue to closely watch Pierce to make certain

32

that appropriate standards were met.  Certainly, nothing suggests Shay was party to any FMLA-retaliation scheme.  On the contrary, that she was not involved in the laboratory, yet reached the same conclusions, tends to establish that, whether fair or unfair, whether right or wrong, Pierce and the laboratory were indeed considered to be problems on their own merit, unrelated to the two week FMLA leave.

The leave taken was of rather modest duration as well – only two weeks out of twelve weeks available.  A one time leave of only two weeks to attend to a terminally ill father is not the type of absence generally thought to evoke hostile retaliatory action from a fairly large employer.  It is possible, but no evidence presented here suggests such employer hostility, and any inferences of causal connection that might be coaxed from the contemporaneous leave, Meyer's comment, and adverse personnel actions taken are far too weak to support a preponderance finding of retaliation by a reasonable jury, even in combination with the other evidence proffered.

Finally, nothing suggests that the deficiencies identified by Donovan were not real, were not serious, or were invented as cover for FMLA retaliation. On the contrary, the record establishes that those deficiencies implicated patient safety as well as the validity of medical testing done in the lab – all basic, legitimate employer concerns. Not to overstate the matter, but the identified deficiencies alone would have justified the hospital's decision to seek new leadership for the medical laboratory.

In this case, Pierce's evidence creates, at best, only a very weak issue of fact as to whether APD's reasons for changing her job title (without any loss in pay or benefits) and later asking for her resignation were untrue. The record, on the contrary, presents abundant, and generally uncontroverted, evidence that no FMLA discrimination occurred. No rational jury could find by a preponderance of the evidence presented that APD's explanation was false or that its decisions were discriminatory based on Pierce's having taken FMLA-protected leave. While Pierce's prima facie case, _if_ combined with _sufficient_ evidence to find APD's asserted justification for its

34

adverse employment decisions false, might give rise to a genuine issue of fact regarding discriminatory intent (<u>Reeves</u>, <u>supra</u>), here Pierce's evidence is entirely insufficient to support a finding of falsity.

## Conclusion

Pierce has not met her step three burden under <u>McDonnell Douglas</u>. She has not presented sufficient evidence to support a jury verdict in her favor, and she has not presented evidence which, taken in the light most favorable to her, is sufficient to permit a rational factfinder to resolve the issue of retaliatory motivation in favor of either side. In short, she has not presented evidence sufficient to support a finding that APD's legitimate, nondiscriminatory explanation for its employment decisions was false. Accordingly, defendant's motion for summary judgment (document no. 6) is granted. The Clerk of Court shall enter judgment in accordance with this order and close the case.

35

**SO ORDERED.**

                                _____

Steven J. McAuliffe
United States District Judge

March 11, 2002

cc:  Andru H. Volinsky, Esq.
      Kathleen C. Peahl, Esq.